WILLIAM C. SAMPSON AND LUCILLE A. SAMPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sampson v. Commissioner
Docket No. 14039-84.
United States Tax Court
T.C. Memo 1988-202; 1988 Tax Ct. Memo LEXIS 227; 55 T.C.M. (CCH) 800; T.C.M. (RIA) 88202; May 5, 1988. *227 William C. Sampson and Lucille A. Sampson, pro se. Nancy B. Herbert, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as *228 follows: [1] Sec. 6653(a)(1) Sec. 6653(a)(2)
Year
Deficiency
Addition
Addition
1980
$ 19,064
$ 953  - 0 -
1981
26,449  1,322  50% of interest
due on $ 26,4419
*229 The issues for decision are: (1) Whether income from petitioner William C. Sampson's osteopathic practice and income from petitioner Lucille A. Sampson's sales of Shaklee products are properly taxable to the petitioners as the earners of the income or to the Lucille A. Sampson Pure Equity Trust; (2) Whether the trust is a grantor trust under sections 671-677; (3) Whether petitioners have substantiated deductions claimed for automobile expenses incurred in earning the Shaklee products sales income; [2]
(4) Whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations; and (5) Whether petitioners are liable for damages under section 6673 for instituting or maintaining this case primarily for delay or for maintaining a frivolous or groundless position in the Tax Court. *230 FINDINGS OF FACT A few of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Dr. William C. Sampson and Lucille A. Sampson (collectively petitioners) resided in Middletown, Ohio at the time they filed their petition in this case. Dr. Sampson is also known as W. Clifford Sampson and W. C. Sampson. For the taxable years 1980 and 1981, petitioners filed joint Federal income tax returns at the Cincinnati Service Center in Covington, Kentucky. On those returns, Dr. and Mrs. Sampson listed their occupations as osteopath and housewife, respectively. During 1980 and 1981, Dr. Sampson earned substantial income from his osteopathic practice, which he conducted through his professional corporation, Dr. W. Clifford Sampson, Inc., or W. Clifford Sampson, Inc. During 1980 and 1981, Mrs. Sampson earned income as a distributor of Shaklee Products. In an effort to shift the incidence of taxation, petitioners diverted their earned income through several entities as will be outlined in detail below. In 1975 petitioner formed W. Clifford Sampson, Inc., pursuant *231 to the Ohio corporation law, a professional corporation which is still in existence. Petitioner owns all of the stock of his professional corporation. Petitioner and his wife were the only officers of the corporation and completely controlled the corporation. Dr. Sampson was the only person performing osteopathic services for his professional corporation. W. Clifford Sampson, Inc., filed Form 1120 corporate income tax returns for 1980 and 1981 taxable years, reporting gross receipts of $ 29,181 and $ 67,926, respectively. The corporation deducted cost of goods sold of $ 24,738 and $ 54,391 for 1980 and 1981, respectively. For 1980 the cost of goods sold included drugs in the amount of $ 1,393 and professional fees (for Dr. Sampson's services) of $ 23,345. For 1981 the cost of goods sold consisted solely of professional fees for Dr. Sampson's services of $ 54,391. On April 1, 1975, petitioners also formed the Lucille A. Sampson Pure Equity Trust. The trust agreement is a form with appropriate blanks to be filled in. Petitioners executed the document and entered into the family trust arrangement without consulting an attorney and without obtaining any legal advice as to the *232 matter. Roger L. and Joan M. Whitesel, who had a similar family trust arrangement, witnessed the document. Lelah M. Truxal and W. Clifford Sampson were the first trustees. Mrs. Truxal resigned shortly after the formation of the trust. Mrs. Truxal and her husband also had a similar family trust arrangement. During 1980 and 1981, Bruce A. Sampson, Diane Sampson Spear, Lucille A. Sampson, and William C. Sampson were the trustees of the Lucille A. Sampson Pure Equity Trust. Bruce A. Sampson and Diane Sampson Spear are petitioners' children. In 1980 and 1981, the beneficial interests of the Lucille A. Sampson Pure Equity Trust were held as follows: 1980
1981
Bruce A. Sampson
15
50
Diane Sampson Spear
15
50
Lucille A. Sampson
30
0 William C. Sampson
40
0 Petitioners transferred their residence and the surrounding four acres at 5911 W. Alexandria Road, Middletown, Ohio to the trust in 1975. Other than its use as an office for Mrs. Sampson's Shaklee products distribution business, this property did not produce income and continued to be used as petitioners' family residence as it had before 1975. [3] Thus, the sources of income of the trust were *233 Dr. Sampson's osteopathic practice and Mrs. Sampson's sales of Shaklee products. On April 10, 1975, Dr. Sampson executed a professional service contract with the Lucille A. Sampson Pure Equity Trust. The contract provided: The TRUST and Dr. W. C. Sampson do covenant and agree as follows: 1. The TRUST agrees to furnish the following to Dr. W. C. Sampson for his services as an Osteopathic Physician to the TRUST. a) The use of the TRUST properties with paid utilities for living and working quarters for other uses than TRUST use. b) The use of a telephone listed in his name for other than TRUST business, and payment of the telephone bill. c) The use of a leased automobile for other than TRUST business. 2. Dr. W. C. Sampson agrees to give his professional services to the TRUST for the above listed benefits of paragraph 1.
Petitioner signed in his own right and as trustee of the *234 Lucille A. Sampson Pure Equity Trust. On September 16, 1975, W. Clifford Sampson, Inc., contracted with the Lucille A. Sampson Pure Equity Trust for petitioner's professional services. The contract provided: The COMPANY and the TRUST do covenant and agree as follows: 1. The TRUST agrees to furnish the expertise and knowledge of Dr. W. C. Sampson, D.O. to the COMPANY. The COMPANY accepts the expertise and knowledge of Dr. W. C. Sampson, D.O. The services to be provided shall be understood by both parties to consist of the skills denoted an Osteopathic Physician licensed by the State of Ohio. 2. The COMPANY cannot control or supervise the work or services to be performed by Dr. W. C. Sampson. The TRUST agrees that Dr. W. C. Sampson shall devote his time and effort to the business of the COMPANY and all remuneration earned belongs to the COMPANY. 3. The TRUST shall be compensated for the services of Dr. W. C. Sampson to the COMPANY, a fee equaling 82% per annum of the income earned for the COMPANY by Dr. W. C. Sampson. That fee, in part or in whole, shall be paid on demand of the TRUST. Any modification of this fee shall be in writing and agreed to by both parties. *235 Petitioner signed the contract as president of the corporation and as trustee of the trust. In 1980, pursuant to the above outlined contracts, W. Clifford Sampson, Inc., paid the Lucille A. Sampson Pure Equity Trust $ 23,345, the amount of the professional fees the corporation had deducted as part of its cost of goods sold. The corporation deducted this amount on its Form 1120 as a component of the cost of goods sold, deducted rent and various other items, and reported taxable income of $ 289 and paid tax of $ 49. The Lucille A. Sampson Pure Equity Trust reported $ 23,345 as imcome from the W. Clifford Sampson, Inc., professional corporation. The trust also reported income of $ 1,275, the net profit from Mrs. Sampson's sales of Shaklee products, on its 1980 Form 1041, fiduciary income tax return. After deductions, the trust purportedly distributed a total of $ 9,750 in various amounts to the following beneficiaries: W. Clifford Sampson
$ 4,386
Lucille Sampson
2,438
Diane Sampson Spears
1,463
Bruce A. Sampson
1,463
$ 9,750
However, these amounts were in each instance reduced by claimed depreciation deductions so that the amounts actually received by *236 the individuals and reported on their individual returns were as follows: W. Clifford Sampson
$ 2,090
Lucille Sampson
1,163
Diane Sampson Spears
698
Bruce A. Sampson
698
In addition, the Lucille A. Sampson Pure Equity Trust issued a Form 1099-NEC (nonemployee compensation) to Dr. Sampson in the amount of $ 1,960 which the trust deducted on its return as fiduciary fees and which Dr. Sampson reported on his return as income from wages, salaries, tips, etc. The trust issued another Form 1099-NEC to Dr. Sampson in the amount of $ 3,670 which does not appear to have been deducted by the trust but was reported as rental income from two unidentified properties on petitioners' return, reduced by depreciation, and a net amount of $ 1,928 reported as income for the year. After various deductions for housing, trustee medical expenses, insurance, auto expenses, utilities, telephone, bank charges, dues and subscriptions, and trust educations [sic] expenses totaling $ 9,9l0, the Lucille A. Sampson Pure Equity Trust reported no taxable income and no tax due for 1980. Of the $ 23,345 income earned by Dr. Sampson in the performance of osteopathic services in 1980 and *237 after funneling that money through the Dr. W. Clifford Sampson, Inc., professional corporation and the Lucille A. Sampson Pure Equity Trust and of the net profit of $ 1,275 for the Shaklee Products business, only the following amounts were reported on petitioners' individual tax return for that year: $ 1,960 as fiduciary fees
paid by trust
to Dr. Sampson
1,928 as net income from
rental properties A
and B on petitioner's
Schedule E
2,090 as Dr. Sampson's net dis-
tribution from the trust
1,163 as Mrs. Sampson's net dis-
tribution from the trust
Total
$ 7,141 In other words, only 29 percent of that total income of $ 24,620 earned by Dr. and Mrs. Sampson was reported by petitioners, and many of their nondeductible personal and family expenses had been deducted as purported business expenses of the trust. None of Mrs. Sampson's income from sales of Shaklee products was reported as such on their personal return, that activity being reported solely by the trust and included in the above figures. Respondent determined a deficiency in the amount of $ 19,064 in petitioners' tax for the 1980 taxable *238 year. [4] The deficiency was based on including in their income the $ 23,345 income from Dr. Sampson's osteopathic practice and the gross receipts of $ 25,256 for the Shaklee products business, less the net trust income distributes to petitioners ($ 2,090 for Dr. Sampson and $ 1,163 for Mrs. Sampson). [5] Respondent now agrees that the cost of goods sold and most of the expenses of the Shaklee products business have now been substantiated. See n.2, supra.
The contracts outlined above terminated on December 30, 1980. On December 31, 1980, Dr. Sampson formed the Sampson Business Trust. The trust agreement was a printed form published by the Sentinel Educational Services. Mrs. Sampson *239 and petitioners' son were the trustees of the Sampson Business Trust, whose principal place of business was listed as 5911 W. Alexandria Road, Middletown, Ohio. See n.3, supra. The purpose of the trust was: The purport of this instrument is to convey certain properties and other considerations of value to the Trustees, to constitute a Trust for the benefit of the beneficiary's [sic], held by the Trustees, in Trust, and for the duration hereof; AND to provide for a prudent and economical administration of This Trust's properties and assets, including the effective management of Trust business affairs. The Trustees shall conserve, maintain, manage, invest and re-invest, and improve the financial rating of This Trust' AND, the Trustees, other than the Grantor, in accordance with the restrictions contained herein, shall make distributions of income, or accumulate for later distributions, or distribute corpus as permitted herein, to the beneficiary's [sic] on a pro rata basis, in accordance with the number of Units held, in amounts determined in the Trustee's sole discretion.
The trust instrument did not identify any beneficiaries and the printed form recited that "The Grantor *240 [Dr. Sampson] shall receive, as part consideration for his conveyance, all the beneficial interest in the income and corpus of this Trust" and that "The Beneficiaries shall hold their beneficial interests upon the terms and conditions contained herein." Among such terms and conditions was a provision that the certificates of interest were "non-assessable, non-negotiable, and, non-transferrable." By another Sentinel Education Services printed form, the trustees issued all 100 units (certificates of interest) to the Lucille A. Sampson Pure Equity Trust as the sole beneficiary of the Sampson Business Trust. On January 1, 1981, Dr. Sampson and the Sampson Business Trust executed a professional services contract whereby petitioner would provide services as an osteopath to the trust. The contract stated: NOW THEREFORE, in consideration of the above premises and the mutual covenants and conditions hereinafter contained, IT IS AGREED: 1. Service: DOCTOR hereby agrees to furnish his skills and expertise to the TRUST, and the TRUST does hereby agree to accept the services of DOCTOR upon the terms and conditions set forth herein. The services to be provided shall be understood by *241 both parties to consist of the skills denoted an Osteopathic Physician licensed by the State of Ohio. 2. Performance: The DOCTOR hereby agrees that all services hereinabove listed shall be performed in a good professional manner and that DOCTOR will at all times faithfully, industriously, and to the best of his ability, experience, and talents, perform all duties that may be required of and from him pursuant to the express and implicit terms hereof, to the reasonable satisfaction of the TRUST. 3. Term of Service: The term of this agreement shall be for a period of one year, commencing as of the above date, terminating on the 1st day of January 1982, OR, until the specific performances agreed to be performed have been completed, subject, however, to prior termination as hereinafter provided. At the expiration date hereof, this agreement shall be considered renewed for regular periods of one year, provided neither party submits notice of termination. 4. Compensation of DOCTOR: For all services rendered by DOCTOR, under the terms of this agreement, the TRUST shall compensate the DOCTOR as follows: a. The use of properties which are rented by the TRUST, with paid utilities, *242 for living and working quarters, and for other personal uses. b. The use of a telephone listed in DOCTOR'S name, and payment of the telephone bill. c. The use of an automobile for other than TRUST business. d. Reimbursement for all necessary expenses incurred while traveling pursuant to the TRUST's direction. 5. Duties: The DOCTOR hereby agrees that he shall devote his time, attention, knowledge and skills solely to the business and interest of the TRUST, and the TRUST shall be entitled to all of the benefits, profits or other issues arising from or incident to all work, services and advice of the DOCTOR.
Petitioner signed for himself, and Lucille A. Sampson and Bruce A. Sampson signed as trustees of the Sampson Business Trust. The Whitesels signed as witnesses. Also on January 1, 1981, W. Clifford Sampson, Inc. ["COMPANY"], contracted with the Sampson Business Trust ["TRUST"] for petitioner's professional services. The contract provided: WHEREAS, the COMPANY is engaged in the business of Osteopathy and desires to contract for the skills of one W. Clifford Sampson, D.O., an Independent Contractor, in the performance of services on behalf of the COMPANY; *243 and WHEREAS, Dr. W. Clifford Sampson is under contract with the TRUST and the TRUST hereby desired Dr. W. Clifford Sampson to perform services, as a sub-contractor, on behalf of the COMPANY with all remuneration therefrom accruing to the TRUST: NOW THEREFORE, in all consideration of the above premises and the mutual covenants and conditions hereinafter contained, IT IS AGREED: 1. SERVICE. The TRUST hereby agrees to furnish the expertise of Dr. W. Clifford Sampson's services to the COMPANY, and the COMPANY does hereby agree to accept the services of Dr. W. Clifford Sampson, upon the terms and conditions set forth herein. The services to be provided shall be understood by all parties to consist of skills denoted an Osteopathic Physician licensed by the State of Ohio. 2. PERFORMANCE. The TRUST hereby agrees that all services as hereinabove listed shall be performed in a good workmanlike manner and that Dr. W. Clifford Sampson will at all times faithfully, industriously, and to the best of his ability, experience, and talents, perform all of the duties that may be required of and from him pursuant to the express and implicit terms hereof, to the reasonable satisfaction of the *244 COMPANY. 3. TERM OF SERVICE. The term of this agreement shall be for a period of one year, commencing as of the above date, termination the 1st day of January 1982, OR, until the specific performances agreed to be performed have been completed, subject, however, to prior termination as hereinafter provided. At the expiration date hereof, this agreement shall be considered renewed for regular periods of one year, provided neither party submits notice of termination. 4. COMPENSATION. For all services rendered by Dr. W. Clifford Sampson for the COMPANY, the TRUST shall be compensated for those services by a fee equal to 80% per annum of the income earned for the COMPANY. That fee, in part or in whole, shall be paid on demand of the TRUST. AND, all amounts shall be paid by the COMPANY to the TRUST without any deductions of any kind.
Dr. Sampson signed the contract as president of W. Clifford Sampson, Inc. Lucille A. Sampson and Bruce A. Sampson signed as trustees of the Sampson Business Trust. The Whitesels signed as witnesses. On December 31, 1980, the Lucille A. Sampson Pure Equity Trust purportedly leased the petitioners' residence at 5911 W. Alexandria Road, Middletown, *245 Ohio, to the Sampson Business Trust for five years. See n.3, supra. The lease stated the premises were to be occupied for: 1. various activities of management; 2. housing for Dr. W. Clifford Sampson as per contract; and 3. housing for Trustees. Lucille A. Sampson signed the lease as trustee of the Sampson Business Trust. Dr. Sampson and Bruce A. Sampson signed as trustees of the Lucille A. Sampson Pure Equity Trust. The Whitesels signed the lease as witnesses. In 1981, as in 1980, petitioners funneled their income through these various entities in an effort to shift the incidence of taxation. In 1981 W. Clifford Sampson, Inc., purportedly paid $ 54,391 to the Sampson Business Trust. The corporation deducted this amount as professional fees, a component of its cost of goods sold. The Sampson Business Trust's principal source of income was the receipts from Dr. Sampson's osteopathic practice. For 1981, the Sampson Business Trust reported as income $ 54,391 from Dr. Sampson's professional fees (reported on a Form 1099-NEC from the W. Clifford Sampson Company, Inc., professional corporation) and $ 2,916.91 as a management fee allegedly paid by the Lucille A. Sampson Pure *246 Equity Trust. The Sampson Business Trust then showed a distribution of $ 29,484 to the Lucille A. Sampson Pure Equity Trust, deductions of $ 27,336 (including rent of $ 10,200 -- see n.3, supra), and no taxable income. Although the Sampson Business Trust's K-1 shows a distribution of $ 29,484 to the Lucille A. Sampson Pure Equity Trust, the Forms 1099-NEC (nonemployee compensation) show a payment of $ 6,500 to that trust and a payment of $ 29,484 to William C. Sampson, for a total of $ 35,984. The figure of $ 35,984 is the amount reported on the 1981 return of the Lucille A. Sampson Pure Equity Trust as income from the Sampson Business Trust. The other item of income reported by the Lucille A. Sampson Pure Equity Trust was the net income of $ 3,426 from the Shaklee products business. Diane Sampson Spears and Bruce A. Sampson each received $ 2,569 as the beneficiaries' share of income in 1981 from the Lucille A. Sampson Pure Equity Trust, and presumably reported those amounts on their tax returns. The Lucille A. Sampson Pure Equity Trust deducted interest, taxes, charitable contributions, bank charges, housing maintenance and repair expenses, management fees and fiduciary fees *247 of $ 25,459, reporting no taxable income and no tax due for 1981. The $ 25,459 "fiduciary fees" represented amounts of $ 12,730 for Dr. Sampson and $ 12,729 for Mrs. Sampson, which amounts petitioners reported on their individual income tax return for 1981. Thus, of the $ 54,391 income earned by Dr. Sampson in the performance of osteopathic services in 1981 and of the net profits of $ 3,426 earned by Mrs. Sampson in the Shaklee products business, only $ 25,459 was reported on their tax return that year. In other words, after funneling their total earned income of $ 57,817 through these various paper entities, only 44 percent of the income was reported by them and many of their nondeductible personal and family expenses had been deducted as purported business expenses of those entities. Respondent determined a deficiency in the amount of $ 26,449 in petitioners' tax for the 1981 taxable year. The deficiency was based on including in their income the $ 35,984 income from the Sampson Business Trust [6] and the gross receipts of $ 38,187 from the Shaklee products business, less the $ 25,459 "fiduciary fees" actually reported by petitioners. Respondent now agrees that the cost of *248 goods sold and most of the expenses of the Shaklee products business have now been substantiated. See n.2, supra.
During 1980 and 1981, petitioners performed all the osteopathic and sales services that produced the income flowing through these various entities. W. Clifford Sampson, Inc., the Sampson Business Trust, and the Lucille A. Sampson Pure Equity Trust did not employ any other osteopaths during 1980 and 1981. Mrs. Sampson performed the services for the Shaklee products business. Petitioners maintained complete control over the income at all times. *249 [7]
The Lucille A. Sampson Equity Trust claimed $ 753 and $ 1,035 in deductions for automobile expenses, on the Schedule C's for Mrs. Sampson's Shaklee *250 products business in 1980 and 1981, respectively. No contemporaneous records of the expenditures were maintained. The "records" of the expenses produced at trial were mere estimates. There is no persuasive evidence to establish the reasonableness of these estimates. As noted above, petitioners did not seek or obtain any legal advice before embarking on their family trust arrangement. Before the trial of this case petitioners were furnished information about this Court's many opinions in the family trust area and were furnished copies of some of those opinions. Petitioners were specifically aware of the outcome of the cases of the Truxals and Whitesels, their acquaintances who had similar family trust arrangements and who were involved in various capacities (witnesses, trustees) in petitioners' own family trust arrangement. Whitesel v. Commissioner,T.C. Memo. 1983-9, affd. without published opinion 745 F.2d 59 (6th Cir. 1984); Truxal v. Commissioner,T.C. Memo. 1982-616. Petitioners were warned before trial about the possibility of the imposition of damages under section 6673. [8]
*251 OPINION It is a basic principle of the tax law that income is taxable to the one who earns it, and the incidence of taxation cannot be shifted by anticipatory assignments of that income through contracts, trusts or other devices. Lucas v. Earl,281 U.S. 111, 114-115 (1930); Commissioner v. Culbertson,337 U.S. 733, 739-740 (1949). Determining who earns the income depends upon which person or entity in fact controls the earning of the income, not who ultimately receives the income. Benningfield v. Commissioner,81 T.C. 408, 419 (1983); Johnson v. Commissioner,78 T.C. 882, 891 (1982), affd. 734 F.2d 20 (9th Cir. 1984) without published opinion; American Savings Bank v. Commissioner,56 T.C. 828 (1971). Here petitioners not only earned the income, they controlled the income at all times, and ultimately received all of the funds except some small sums that their son and daughter may have received. These well-established principles have been followed in a long line of family trust cases *252 similar to the present case, and those cases have uniformly rejected the taxpayer's attempts to shift the incidence of taxation by such devices. Hanson v. Commissioner,696 F.2d 1232 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; Horvat v. Commissioner,671 F.2d 990 (7th Cir. 1982), originally released as an unpublished order 582 F.2d 1282 (7th Cir. 1978), affg. a Memorandum Opinions of this Court, cert. denied 440 U.S. 959 (1979); Schulz v. Commissioner,686 F.2d 490 (7th Cir. 1982), affg. two Memorandum Opinions of this Court; Gran v. Commissioner,664 F.2d 199 (8th Cir. 1981), affg. a Memorandum Opinion of this Court; Vnuk v. Commissioner,621 F.2d 1318 (8th Cir. 1980), affg. a Memorandum Opinion of this Court; Luman v. Commissioner,79 T.C. 846 (1982); Vercio v. Commissioner,73 T.C. 1246 (1980); Markosian v. Commissioner,73 T.C. 1235 (1980); Wesenberg v. Commissioner,69 T.C. 1005 (1978). [9]
*253 Here Dr. Sampson performed the osteopathic services and earned the income from his medical practice. Similarly Mrs. Sampson performed the services and earned the income from her Shaklee products business. This case involves simply an attempted anticipatory assignment of income, an attempt to divert petitioners' earned income to another entity by "paper transactions" which have no effect on the economic realities of the situation. United States v. Basye,410 U.S. 441, 450 (1973); Markosian v. Commissioner, supra,73 T.C. at 1241. Here nothing was changed by the interposition of the Lucille A. Sampson Pure Equity Trust (and/or the Sampson Business Trust) between petitioners and the income earned by Dr. Sampson in his osteopathic practice and by Mrs. Sampson in her Shaklee products business except to try to avoid reporting 29 to 44 percent of that income and to try to claim nondeductible personal and family expenses as purported business expenses of the trust(s). On brief petitioners objected to the Court's use of the term "real world" when questioning them about who performed services and who earned the income, contending that the term is "without *254 legal precedent." The Court's inquiries were directed toward what happened in the real world as opposed to the world of "financial fantasies." As stated by the Seventh Circuit, in a similar context of tax avoidance gimmickry: The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future. [Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).]
Without regard to today's tax-shelter-and-tax-gimmick climate, that view is nothing more than what the Supreme Court was voicing in Lucas v. Earl, when it said that tax incidence is not to be decided by "attenuated subtleties," that tax cannot "be escaped by anticipatory *255 arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it," and that the fruits cannot be "attributed to a different tree from that on which they grew." 281 U.S. at 114, 115. Looking beyond contrived forms to the economic substance of the transaction is what this and other courts do in the family trust area. This is not an approach "without legal precedent" but is solidly grounded in the Supreme Court's earliest opinions on the use of contracts, trusts and other devices to try to shift the incidence of taxation from the person who earned it. The income was properly taxable to petitioners and not to the Lucille A. Sampson Pure Equity Trust or the Sampson Business Trust. In view of our holding on the assignment of income principles, we need not address the grantor trust provisions of section 671 et seq. However, on the facts of this case, it is clear that the income would be taxable to petitioners under these "grantor trust" rules. Vnuk v. Commissioner, supra;Vercio v. Commissioner, supra;Wesenberg v. Commissioner, supra.
*256 Deductions are a matter of legislative grace, and the taxpayer must establish the elements of entitlement to the deduction claimed. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). Here respondent disallowed the local automobile expenses claimed each year on the Schedule C for the Shaklee products business. Petitioners have the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners have failed to carry their burden. When a taxpayer proves that an expenditure was made, that some part of the expenditure was made for deductible purposes, and when the record contains sufficient evidence for us to make a reasonable allocation, we will do so. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, the record in this case provides no basis for making any allocation, and indeed no persuasive evidence of any expenditure. On this record, a deduction based on the Cohan rule would be sheer "unguided largesse." Williams v. United States,245 F.2d 559, 560 (5th Cir. 1957). Accordingly, respondent's determination must be sustained. *257 The next issue is whether petitioners are liable for the addition under section 6653(a) for negligence or intentional disregard of rules and regulations. Petitioners have the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791 (1972); Rosano v. Commissioner,46 T.C. 681, 688 (1966). Dr. Sampson is a well-educated individual, and yet embarked on this family trust gimmick without consulting an attorney and without obtaining any legal advice on the matter. As one court has observed "No reasonable person would have trusted this scheme to work." Hanson v. Commissioner, supra,696 F.2d at 1234. Mrs. Sampson, although engaged in the Shaklee products business, listed her occupation on her individual tax returns as "housewife," and the Shaklee products income was shown only on the Schedule C's filed with the returns of the Lucille A. Sampson Pure Equity Trust. More importantly, both petitioners knew how much they had earned, knew that through these paper trust devices most of their income had miraculously disappeared, and knew that they were only reporting 29 to 44 percent of their earned income. On these facts, *258 and in view of the long line of family trust cases rejecting this discredited gimmick, the negligence addition is well warranted in this case. Lastly, we must consider respondent's request for damages under section 6673. That section permits the Court to award damages to the United States in an amount not in excess of $ 5,000, whenever it appears to the Court that proceedings before it "have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless." Here petitioners were informed in advance of the trial of the uniformly adverse opinions in the family trust area and were also given copies of some of those opinions. Moreover, petitioners were specifically aware of the adverse outcome of the family trust cases involving their acquaintances, the Whitesels and the Truxals, whose family trust arrangements were similar to their own. The Truxal and Whitesel cases [10] had been handed down by this Court before petitioners filed their petition in this case. Accordingly petitioners knew or should have *259 known that their position in this case was legally frivolous or groundless. Also petitioners were warned before the trial that respondent would seek damages under section 6673 if they pursued their frivolous or groundless position. Damages were considered in petitioners' case involving their earlier years, 1975 to 1979, but were not imposed because of a jurisdictional issue for two of those years. [11] As noted in that opinion, damages can be imposed even where adjustments have been made in the taxpayer's favor. See Bell v. Commissioner,85 T.C. 436 (1985). [12] In the instant case, there are adjustments to be made in the Rule 155 computation in petitioners' favor. One adjustment relates to the cost of goods sold and most of the expense items on the Schedule C's for the Shaklee products business. See n.2, supra. At the commencement of the trial, the parties orally *260 stipulated that the cost of goods figures and the expense items, other than automobile expense, on the Schedule C's were correct. Respondent so stipulated based on substantiation furnished a day or two before trial. Had such substantiation been produced by petitioners earlier, the matter no doubt could have been disposed of earlier. The other adjustment is one directed by the Court on its own as a result of the Court's close analysis and tracing of the funds through the various paper entities. See n.5, supra. However, these adjustments, while in petitioners' favor, do not represent disputed issues that they have successfully litigated. Instead these adjustments represent corrections to petitioners' taxable income as determined by respondent which respondent and the Court have made in spite of, and not because of petitioners' pursuit of their basically frivolous and groundless position. Accordingly, these favorable adjustments will not serve to insulate petitioners from damages, and the Court awards damages to the United States in the amount of $ 3,500. *261 To reflect the parties' stipulations and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. In the statutory notice of deficiency, respondent included in petitioners' income each year the gross receipts from Mrs. Sampson's Shaklee products business, but disallowed all deductions and costs of goods sold claimed on the Schedule C's filed as part of the Forms 1041 filed by the Lucille A. Sampson Pure Equity Trust. At trial respondent agreed that petitioners were entitled to all properly substantiated Schedule C expenses and costs of goods sold for the Shaklee products business. The parties orally stipulated at the beginning of the trial that the costs of goods sold and all Schedule C expenses for the Shaklee products business had been substantiated except the item of car expenses in the amount of $ 753 for 1980 and $ 1,035 for 1981. ↩
3. The Lucille A. Sampson Pure Equity Trust did not report any rental income in connection with this property. However, we note that the Sampson Business Trust whose address was also listed as 5911 W. Alexandria Road, Middletown, Ohio, deducted rent in the amount of $ 10,200 in 1981. ↩
4. On brief petitioners emphasize that respondent for 1980 and 1981 issued a "no change letter" to the Lucille A. Sampson Pure Equity Trust. However, those no change letters were expressly qualified by a statement that the trust income was involved in the investigation of another taxpayer, i.e., petitioners herein. ↩
5. In the Rule 155 computation Dr. Sampson should also be given credit for the $ 1,960 and $ 1,928 amounts that he reported, in addition to the net distributions from the trust. ↩
6. This is the amount purportedly paid by the Sampson Business Trust to the Lucille A. Sampson Pure Equity Trust. There is no explanation as to why respondent did not include the entire $ 54,391 which represents the net professional fees of Dr. Sampson for the year. The professional corporation, Dr. W. Clifford Sampson, Inc., had gross receipts of $ 67,926 and deducted the entire amount of $ 54,391 for Dr. Sampson's earned professional fees and purportedly paid that amount to the Sampson Business Trust. However, respondent has not sought an increased deficiency for 1981, and we will accept the lower figure of $ 35,984. ↩
7. Diane Sampsom Spears' testimony established that she did little or nothing as a trustee of the Lucille A. Sampson Pure Equity Trust. At the infrequent meeetings of the board of trustees, she never discussed the main source of trust income, her father's practice as an osteopath. At best they may have discussed home improvements at these infrequent meetings. Indeed, she testified she never voted "no" at a trustee meeting. Bruce A. Sampson did not testify at the trial. Dr. Sampson testified the checks for payment for his osteopathic services were made out to W. Clifford Sampson, Inc., Dr. Sampson, or Dr. W. C. Sampson. Pressed on what conclusion to draw from this, he testified "my wife and I" conttrolled the funds. Mrs. Sampson's testimony as to her role as a "trustee" was vague, conclusory, and wholly unworthy of belief. The Court is satisfied that petitioners, principally Dr. Sampson, exercised complete control over the funds at all times and that the various entities were nothing more than meaningless pieces of paper. ↩
8. In petitioners' own case for their earlier years, 1975-1979, damages under section 6673 were considered but not imposed. The Court noted, however, "while we believe that petitioners, in substantial part, did not intend to proceed with a meritorious action in this Court, we note that there was a jurisdictional issue for the taxable years 1975 and 1976," and in a footnote it was pointed out that adjustments in petitioners' favor will not necessarily preclude an award of damages. See Sampson v. Commissioner,T.C. Memo. 1986-231↩. 9. See also Whitesel v. Commissioner,T.C. Memo. 1983-9, affd. without published opinion 745 F.2d 59↩ (6th Cir. 1984). Moreover, this Court has decided well over 50 of these family trust cases by unpublished Memorandum Opinions,, ruling against the taxpayer in each instance. 10. See Truxal v. Commissioner,T.C. Memo. 1982-616; Whitesel v. Commissioner,T.C. Memo. 1983-9, affd. by unpublished opinion 745 F.2d 59↩ (6th Cir. 1984). 11. See Sampson v. Commissioner,T.C. Memo. 1986-231↩. 12. See also Ruberto v. Commissioner,T.C. Memo. 1987-623; Piche v. Commissioner,T.C. Memo. 1986-29↩.